2021 IL App (1st) 191092-U

No. 1-19-1092

Order filed May 4, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 17753 |
| | ) | |
| RONALD WILLIAMS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for possession of a stolen motor vehicle is affirmed over his challenge to the sufficiency of the evidence he knew the vehicle was stolen.

¶ 2    Following a jury trial, defendant Ronald Williams was found guilty of possession of a stolen motor vehicle and sentenced to 75 months' imprisonment. On appeal, defendant contends his conviction should be reversed where the State failed to prove he knew the vehicle he was driving was stolen. We affirm.

¶ 3      Defendant was charged with one count of possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2018)), which alleged he possessed a Chevrolet Astro van belonging to Alex Mendoza while not being entitled to the possession of that vehicle and while knowing it to have been stolen. As defendant only challenges the State's proof of his knowledge the van was stolen, we recite only those facts necessary to decide this appeal.

¶ 4      Alex Mendoza testified he bought a Chevrolet Astro van with a certain license plate number from a private seller in September 2017. He identified his van in a photograph, as well as his title to the van and its Vehicle Identification Number (VIN). The State moved this photograph and Mendoza's title into evidence. Mendoza had three sets of keys to his van: one set for his "day to day" use, a "backup" set at his home, and a third set his father kept at his own home.

¶ 5      On November 20, 2018, Mendoza parked his van in the lot behind his home. He turned off the engine and removed the key, manually locked the doors, and checked to ensure the doors were locked. The van had no broken locks or damage of any kind. At approximately 4:00 or 5:00 p.m. that day, Mendoza left to go to his father's house, and his van was in the lot where he parked it. Mendoza and his girlfriend drove to his father's house in his girlfriend's car and returned home at approximately 11:45 p.m. At that time, Mendoza's van was no longer in the lot where he parked it. He called several towing companies, but none of them had towed his van from the lot, so he called police to report his van had been stolen. Mendoza had both of his sets of keys, and his father had his set of keys. Mendoza had not given anyone, including defendant, permission to use the van. He did not know defendant.

¶ 6    On November 22, 2018, police notified Mendoza they had recovered the van, so he went to an impound lot to pick it up. Mendoza "noticed right away that the steering column was ripped off and the van was basically torn up, it was a mess."

¶ 7    Mendoza identified a photograph of the passenger-side door of his van as it appeared on November 22, 2018, which he testified depicted the door lock as "broken." This lock was not broken on November 20, 2018. Mendoza also identified a photograph of the van's steering column as it appeared on November 22, 2018. This photograph depicts the driver side of the steering column with no covering; the internal components of the steering column are visible. Mendoza testified "the casing ha[d] been removed," revealing "[e]xposed parts, wires" and a "lever" that could be used to start the van "now because the key [didn't] work." This was not how the steering column appeared when Mendoza parked the van behind his home on November 20, 2018. The State moved these photographs into evidence.

¶ 8    Mendoza had the van towed to a mechanic, who demonstrated how to start the van using the "Allen wrench-looking lever" on the steering column, "push[ing] it in halfway to turn on the power and then all the way to start the engine." Mendoza had to pull the lever out once to turn off the engine and a second time to turn off the power.

¶ 9    Chicago police officer Dwayne Gross testified he and his partner were on duty and driving a marked police vehicle at 57th Street and Michigan Avenue at approximately 1:10 p.m. on November 22, 2018. Gross saw a white van traveling south on Michigan and the driver of the van using a cell phone, so Gross and his partner activated their emergency lights, followed the van, and curbed it at 58th and Michigan. Gross knew the van shut off after he curbed it because he saw the taillights turn off and the exhaust smoke stop.

¶ 10    After the van stopped, Gross saw defendant, whom he identified in court, exit the van with a cell phone in his right hand. As the officers were still running the van's license plates, Gross ordered defendant to get back into the van and defendant complied. Gross then approached the driver side of the van, ordered defendant to exit it, and arrested him. Defendant was the only person inside the van.

¶ 11    Gross returned to the van to look for the keys, but did not find them. He saw "the plastic was missing off the steering column," which, in Gross's experience as a police officer, indicated the van was stolen. Gross also saw "tools" inside the van. Gross asked defendant where the keys were; defendant stated he did not have them. Gross returned to the passenger side of the van and saw the "lock mechanism seemed to be tampered with, the plastic seal was pulled off," which indicated "[t]hat may have been the point of entry." After running the van's license plate number and VIN through the LEADS database, Gross and his partner determined the van belonged to Mendoza and was stolen. Gross and his partner transported defendant to a police station and contacted Mendoza. Gross left the van on scene because he was unable to start it. The van was towed to an impound lot.

¶ 12    Gross identified a video recording from his police vehicle's in-car camera, which the State moved into evidence. This video depicts Gross's police vehicle curbing a white van. Approximately 30 seconds after the van stops, a man, who Gross identified as defendant, opens the driver-side door, steps out, and faces Gross's vehicle. Seconds later, defendant returns to the van's driver seat and closes the driver-side door. Two officers, who Gross identified as himself and his partner, approach the driver side of the van. Defendant lowers the driver-side window, then opens the driver-side door and steps out. Gross immediately handcuffs defendant behind his back,

then looks into the van through the open driver-side door. Gross walks defendant toward the police vehicle. Gross returns to the van and leans through the open driver-side door.

¶ 13    Gross also identified a still photograph from a video recording made by his body-worn camera, which he testified depicted the passenger side of the van "with the rubber gasket broken from the locking mechanism." The State moved this photograph into evidence.

¶ 14    On cross-examination, Gross testified defendant complied with all of his orders, was cooperative, and did not attempt to flee either while driving the van or on foot. When Gross conducted a pat-down search of defendant, he did not find any tools on his person. Defendant provided the name of the person who started the van for him. Nothing had been removed from the van's dashboard and its VIN had not been altered. The van's steering column was not tested for fingerprints.

¶ 15    Defendant moved one photograph into evidence, which Gross identified as depicting "[i]nside the vehicle, the steering colmun, the dashboard."

¶ 16    Defendant testified he was at his uncle Michael Mullins's home on November 22, 2018. At approximately 1:00 p.m., Mullins asked defendant to go to the store. Mullins went to his apartment building's parking lot while defendant got dressed. Mullins returned and defendant went out to the parking lot, where he saw a Chevrolet van with its engine running.

¶ 17    Defendant did not touch the steering column of the van or use any kind of tool on it. Defendant did not notice anything "unusual" about the van and he trusted his uncle to "give [him] a legit car." He did not "think to look at the ignition" of the van. Defendant got into the van and drove on Michigan Avenue near 56th Street. Three to five minutes later, police pulled him over.

Defendant "threw the [van] in park," then the van "cut off on its own because *** something was wrong with the gas." Defendant told police his uncle started the van for him.

¶ 18    Defendant acknowledged he had been convicted of delivery of a controlled substance in 2013 and 2009.

¶ 19    On cross-examination, defendant testified Mullins was a mechanic and had two or three cars in the lot behind his home. Mullins did not give defendant keys to the van and did not show him how to start it or turn it off. Defendant could not see that the steering column of the van was "peeled" and did not notice there were no keys in the ignition until police pulled him over. Defendant was not using his cell phone when he saw police at 57th and Michigan. He put the van in park using the gear shifter located "right by the ignition key." Defendant exited the van after police pulled him over. In a photograph, he identified himself exiting the van with his cell phone in his right hand. The State moved this photograph into evidence.

¶ 20    In closing, the State argued defendant knew the van was stolen because of "how he had to operate it, how he needed somebody else to turn it on for him, how he needed to pull that silver Allen wrench lever not once but twice to cut it off." In response, defendant argued he could not have seen the condition of the steering column when he entered the van and there was no evidence he used "an Allen wrench" to turn the van off.

¶ 21    Instructed on both possession of a stolen motor vehicle and criminal trespass to a vehicle, the jury found defendant guilty of possession of a stolen motor vehicle.

¶ 22    Defendant filed a motion for new trial, which argued the State failed to prove him guilty beyond a reasonable doubt. The court denied this motion.

¶ 23    The trial court sentenced defendant to 75 months' imprisonment.

¶ 24    Defendant filed a motion to reconsider sentence, which was denied.

¶ 25    On appeal, defendant only challenges his conviction for possession of a stolen motor vehicle. Specifically, he contends the State failed to prove beyond a reasonable doubt he knew the van was stolen.

¶ 26    When a defendant challenges the sufficiency of the evidence, we examine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Bradford*, 2016 IL 118674, ¶ 12. We allow all reasonable inferences in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. We do not substitute our judgment for that of the factfinder regarding the credibility of witnesses, the weight to be given to the evidence, or the reasonable inferences to be drawn from the evidence. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. We will only set aside a defendant's conviction if the evidence is so improbable or unsatisfactory as to create a reasonable doubt as to his guilt. *Id.*, ¶ 72.

¶ 27    To prove defendant guilty of possession of a stolen motor vehicle, the State had to establish he possessed a stolen vehicle and knew it had been stolen. *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 53; 625 ILCS 5/4-103(a)(1) (West 2018). Defendant does not dispute he was in possession of the van and that it was stolen; he only challenges the proof of his knowledge it was stolen.

¶ 28    Direct proof of knowledge is not necessary; the State may prove knowledge by " 'circumstances that would induce a belief in a reasonable mind that the property was stolen.' " *Jacobs*, 2016 IL App (1st) 133881, ¶ 53 (quoting *People v. Abdullah*, 220 Ill. App. 3d 687, 690 (1991)). A defendant's exclusive and unexplained possession of a stolen vehicle gives rise to an

inference the defendant knew the vehicle was stolen. *Id.*; 625 ILCS 5/4-103(a)(1) (West 2018). The defendant " 'may attempt to rebut the inference of guilty knowledge which arises from the possession of a stolen vehicle, but the defendant must offer a reasonable story or be judged by its improbabilities.' " *Jacobs*, 2016 IL App (1st) 133881, ¶ 53 (quoting *Abdullah*, 220 Ill. App. 3d 691). Knowledge is a question of fact for the jury, and the jury need not accept the defendant's version of the facts as true. *Id.*

¶ 29 A rational factfinder could conclude defendant knew the van he was driving was stolen. Officer Gross's testimony established defendant was in exclusive possession of the van when he pulled defendant over, as defendant was the only person in the van. Defendant did not have keys to the van, and the van's license plate number and VIN indicated it did not belong to him. Mendoza's testimony established he never gave defendant or anyone else permission to use the van or the keys to do so.

¶ 30 Moreover, the physical condition of the van would lead a reasonable person to believe it had been stolen. The condition of the vehicle at issue "is one of the most significant factors which courts consider in determining whether or not the defendant had knowledge of the vehicle's theft." *Abdullah*, 220 Ill. App. 3d at 691. Here, the evidence established defendant drove a van with an exposed steering column and a broken passenger-side door lock, with no keys, that had to be started and stopped using a lever on the exposed steering column. A reasonable jury could conclude defendant knew the van had to be started and stopped in this unusual manner because the van's taillights turned off and the exhausted stopped when police pulled him over. A reasonable person could certainly suspect that a vehicle in this abnormal condition was stolen. Indeed, we have found that a "peeled" steering column is an "important" piece of evidence in establishing a defendant's

knowledge that a vehicle was stolen. See *People v. Ferguson*, 204 Ill. App. 3d 145, 152 (1990). Thus, the evidence supported a rational inference defendant knew the van was stolen.

¶ 31 Defendant argues he "provided a reasonable explanation as to how he came into possession of Mendoza's van, as his testimony that his uncle lent him the van to go to the liquor store was not rebutted." However, the jury already heard defendant's explanation and rejected it. The jury had no obligation to find defendant offered a reasonable story or to accept his version of the facts. See *Abdullah*, 220 Ill. App. 3d at 691; *People v. Tabb*, 374 Ill. App. 3d 680, 692 (2007) ("the jury may believe as much, or as little, of any witness's testimony as it sees fit"). The jury was free to reject defendant's story and to infer he knew the van was stolen, and "we will not second-guess its assessment." See *Jacobs*, 2016 IL App (1st) 133881, ¶ 56. Accordingly, we find the State proved defendant knew the van was stolen beyond a reasonable doubt.

¶ 32 For the foregoing reasons, we affirm defendant's conviction.

¶ 33 Affirmed.